**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

PATRICK MCARDLE, COURTNEY
RAMSEY, and
ANTHONY CUMMINGS,
on behalf of themselves and
all others similarly situated,

               Plaintiffs,             Case No.:  5:19-cv-461

      v.

CITY OF OCALA, FLA.

               Defendant
_____/

**CLASS ACTION COMPLAINT FOR DECLARATORY**
**<u>AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

1.     The City of Ocala is trying to force homeless people to leave town. The Mayor's goal is to ensure "vagrants will be gone" from the City's downtown area.

2.     Named Plaintiffs Patrick McArdle, Courtney Ramsey, and Anthony Cummings bring this class action lawsuit alleging violations of the Eighth and Fourteenth Amendments of the U.S. Constitution and Article I, section 9 of the Florida Constitution on behalf of themselves and other similarly situated individuals experiencing homelessness in the City of Ocala.

3.     Named Plaintiffs bring this lawsuit because they do not have access to fixed, regular, and adequate housing. Due to lack of adequate alternatives, Named

Plaintiffs and hundreds of homeless individuals who are similarly situated have no choice but to sleep or rest on streets or sidewalks, or in woods, parks or other outdoor areas in the City.

4.    Despite the lack of available and accessible shelter space, the City has a policy of "broken windows" policing that includes a "vagrant patrol" to actively identify and arrest homeless individuals for municipal ordinance violations such as "open lodging" with the intent of driving homeless people out of the City. This policy has included implementing police operations in 2018 and 2019 targeted at the homeless population including "Operation Street Sweeper," "Operation Innovation," and a "zero tolerance" action plan.

5.    The City also issues trespass warnings banning homeless individuals from returning to public places (such as public parks) even under circumstances when the individual committed no criminal violation. This has the impact of expelling homeless people from public places and infringes on their constitutionally protected liberty interest to be in public places of their choosing under times and conditions when those places are ordinarily available to members of the public.

6.    Named Plaintiffs have collectively spent 210 days in jail and been assessed over $9,000 in fines, fees, and costs due to the City's enforcement of its "open lodging" ordinance and practice of trespassing homeless people from public places. Named Plaintiffs bring this lawsuit on behalf of themselves and others who are similarly situated to ask this Court to stop the City's unlawful use of police practices

and arrests under unconstitutional ordinances and policies to criminalize homeless people for engaging in life-sustaining conduct essential to survival.

## JURISDICTION

7.     This action seeks declaratory and injunctive relief and damages pursuant to 42 U.S.C. §1983 for past and ongoing injury to Plaintiff's Eighth and Fourteenth Amendment rights under the U.S. Constitution.

8.     This Court has jurisdiction pursuant to 28 U.S.C. §1331, 1343(a)(3) & (4), and the Declaratory Judgment Act, 28 U.S.C. § 2201 & 2202.

9.     This Court has supplemental jurisdiction over Plaintiff's state constitutional claims pursuant to 28 U.S.C. § 1367(a).

## VENUE

10.     Venue is proper in the Middle District of Florida, Ocala Division, pursuant to 28 U.S.C. §1391(b) and Local Rule 1.02. The Plaintiffs reside, Defendant resides, and all of the acts and omissions complained of herein occurred, and will continue to occur, in the Ocala Division of the Middle District of Florida.

## NAMED PLAINTIFFS

11.     Named Plaintiff PATRICK MCARDLE is a resident of the City of Ocala, Florida. He does not have fixed, regular, and adequate housing. He receives food stamps. He works at temporary jobs when he is able to find employment, but does not earn sufficient income that allows him to pay for necessities of life, including housing.

12.     Named Plaintiff COURTNEY RAMSEY is a resident of the City of Ocala, Florida. She does not have fixed, regular, and adequate housing. She is unable to

work due to medical challenges and has applied for SSI benefits. She receives food stamps. She does not have other income that allows her to pay for necessities of life, including housing.

13.    Named Plaintiff ANTHONY CUMMINGS is a resident of the City of Ocala, Florida. He does not have fixed, regular, and adequate housing. He works at temporary jobs when he is able to find employment, but does not earn sufficient income to pay for necessities of life, including housing.

### DEFENDANT

14.    Defendant City of Ocala, Florida (City) is a municipal entity organized under the laws of the State of Florida with the capacity to sue and be sued. The City is sued for injunctive and declaratory relief on the basis of acts of officers, agents, and employees of the City taken pursuant to official policy, practice, or custom.

15.    At all times relevant herein, the officers, agents, and employees of the City and the Ocala Police Department were acting under color of state law.

### CLASS ACTION ALLEGATIONS

16.    Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the Named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

17.    The proposed class represented by the Named Plaintiffs is defined as the class of all persons who currently or during the pendency of this litigation (a) are homeless in that they are without fixed housing and lack the financial resources to provide for their own housing; (b) live within the City of Ocala including individuals who sometimes sleep outside the City to avoid arrest; and (c) have been convicted under

the City of Ocala ordinance, codified at Sec. 42-10 of the Ocala City Code, that prohibits "lodging in the open" ("open lodging").

18.    **Numerosity:** The proposed class is so numerous that joinder of all its members is impracticable. Based on the official 2019 count of homeless individuals in Marion County, 475 people do not have fixed regular and adequate residence. Of those 475 individuals, at least 179 are unsheltered on any given night. Since June 1, 2015, there have been 397 cases charging violations of the City's open lodging ordinance filed in Marion County Court. Plaintiffs estimate based on the homeless counts and number of open lodging prosecutions that approximately 279 homeless individuals have been or will be subjected to the City's unlawful policies, practices and customs because they are homeless in that they are without fixed regular and adequate residence and do not have access to year-round shelter.

19.    **Commonality:** The questions of law or fact that are common to the Named Plaintiffs and proposed class members include whether:

    a.  Named Plaintiffs and class members experiencing homelessness are involuntarily unsheltered in that the number of available shelter beds is exceeded by the number of homeless people in the City of Ocala;

    b.  Defendant's policies, practices, and customs of enforcing the City's "open lodging" ordinance resulting in criminal punishment (incarceration and imposition of fines, fees, and costs) of class members for sleeping or resting while awake on property in City (public or private),

when there is no available alternative shelter, is cruel or unusual punishment in violation of the Eighth Amendment, U.S. Constitution;

c.  Defendant's "open lodging" ordinance and the manner in which it is being applied to Named Plaintiffs and class members fails to provide constitutionally sufficient notice prior to depriving class members of their liberty interests in resting, sleeping, and seeking shelter from the elements, such that a reasonable homeless person in Ocala would understand what conduct is prohibited in violation of the vagueness doctrine under the due process clause of the Fourteenth Amendment to the U.S. Constitution;

d.  Defendant's "open lodging" ordinance and the manner in which it is being applied authorizes and constitutes arbitrary and discriminatory enforcement by casting a wide net of virtually limitless innocent human behavior that is criminalized and leaving it up to the whim of individual police officers to determine who to criminally punish and who to set free in violation of the vagueness doctrine under the due process clause of the Fourteenth Amendment to the U.S. Constitution;

e. Defendant's "open lodging" ordinance authorizes criminal punishment of Named Plaintiffs and class members experiencing homelessness in the form of incarceration and imposition of fines, fees, and costs for sleeping or resting while awake because they are

homeless in violation of the substantive due process clause of the Fourteenth Amendment to the U.S. Constitution;

f.  Defendant's policies, practices and customs of issuing trespass warnings to exclude Named Plaintiffs and class members from being physically present in public parks or other public places generally open to the public deprives them of a constitutionally protected liberty interest to be in public places of their choosing without an opportunity for a hearing violates their right to procedural due process under the Fourteenth Amendment of the U.S. Constitution;

g.  Defendant's policies, practices and customs of using "broken windows" policing and the manner in which it is being applied to Named Plaintiffs and class members who are experiencing homelessness (through police operations like "Operation Street Sweeper", "zero tolerance" action plans, and enforcement of the City's "open lodging" and trespass policies) is motivated by a discriminatory intent to harm and punish a politically unpopular group and lacks a rational basis in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

h.  Defendant's "open lodging" ordinance discriminates on its face and as-applied against Named Plaintiffs and class members by punishing only homeless individuals who have no alternative places to sleep or rest while allowing others to engage in the same conduct if they

have access to housing and an ability to conform their conduct in violation of the Equal Protection Clause to the Fourteenth Amendment of the U.S. Constitution;

i.    Defendant's policies, practices and customs of using "broken windows" policing and the manner in which it is being applied to Named Plaintiffs and class members who are experiencing homelessness (through police operations like "Operation Street Sweeper," "zero tolerance" action plans, and enforcement of the City's "open lodging" and trespass policies) violate their fundamental right to freedom of movement and intrastate travel guaranteed by Article I, section 9 of the Florida Constitution by: preventing homeless people from coming into the City; expelling those already present from the City; and impeding their ability to move freely and engage in harmless, life-sustaining activities such as resting, sleeping, and attempting to protect themselves from the elements.

20.    **Typicality:** The claims of the Named Plaintiffs are typical of the claims of the class as a whole in that the Named Plaintiffs and proposed class members are all homeless in that they are without fixed regular and adequate housing and lack the financial resources to provide for their own housing. They all live within the City of Ocala. Their experiences of arrest, punishment, and exclusion from public places are typical due to their status as homeless persons who must sleep, rest while awake,

and otherwise be physically present in public places that are open to members of the public generally.

21.    **Adequate representation:** The Named Plaintiffs will fairly represent and adequately protect the interests of the proposed class as a whole. The Named Plaintiffs understand their responsibilities as class representatives and are willing to take active roles in prosecuting this litigation. The Named Plaintiffs do not have any interests antagonistic to those of other proposed class members. By filing this action, the Named Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated. The relief sought by the Named Plaintiffs will inure to the benefit of the proposed class generally. The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, constitutional law, practice and procedure in the federal courts, and the prosecution and management of class action litigation.

22.    The City has acted on grounds generally applicable to the proposed class, thereby making final injunctive relief appropriate with respect to the class as a whole under Fed. R. Civ. P. 23(b)(2). The relief sought here-- an injunction prohibiting the City from enforcing its "unlawful lodging" ordinance and its policy of issuing trespass warnings to exclude class members from public places— would resolve the controversy for hundreds of similarly situated individuals. A class action is superior to individual lawsuits for resolving this controversy.

## GENERAL ALLEGATIONS

### *Affordable Housing Availability in Ocala*

23.    The area median income in the Ocala Metropolitan Statistical Area (MSA) is $41,964.

24.    There are more than 33,000 renter households in the Ocala MSA, which account for 25% of the housing market.

25.    Housing is considered affordable to a household at a given income level if the household pays no more than 30% of their income toward rent and utilities.

26.    For rent to be affordable to a minimum wage worker earning $8.25 per hour, it would need to be $429 a month.

27.    To afford a 1-bedroom rental in the Ocala MSA at fair market rent of $674 a month, a household would need to earn $26,960 a year.

28.    To afford a 2-bedroom rental in the Ocala MSA at fair market rent of $815 a month, a household would need to earn $32,600 a year.

29.    In the Ocala MSA, 9,086 low-income renters are cost-burdened, meaning that they pay more than 40% of their income toward housing costs.

30.    The Ocala MSA suffers from a lack of affordable housing for households at or below 60% area median income.

31.    In the Ocala MSA, there are 68 affordable, available rental units per 100 renter households at 60% or less of area median income. The number for households at 30% or less of area median income drops to 22 available, affordable rental units per 100 renter households.

32.     There is limited availability for public housing assistance in Ocala. The availability of public housing or housing vouchers is not enough to meet the need for affordable rental units in Ocala.

33.     The Ocala Housing Authority has 186 public housing units, with 974 families on the waiting list.

34.     The Ocala Housing Authority similarly has a wait list for the Housing Choice Voucher program (Section 8). There are 1,746 individuals currently on the waiting list for Section 8 vouchers. Ocala has an allocated budget of 1,372 Section 8 vouchers, with 108 of those vouchers designated for veterans only under the Veterans Affairs Supportive Housing program.

35.     Of the individuals on the list, there are more than 200 who have been issued a voucher but who have not yet found a unit.

36.     There is an insufficient number of rental housing units available and affordable to low-income people, including Named Plaintiffs and class members.

***Homelessness in Ocala***

37.     At some time during the last 10 days of January each year, the Marion County Homeless Council (Homeless Council) conducts a Housing Inventory Count of the number of beds and units available to house homeless people in the community, including emergency shelter, transitional housing, safe haven housing, and permanent housing that serves people who were homeless at entry into the permanent housing.

38.    During that same time, the Homeless Council conducts a Point-In-Time Count of homeless people in the community.

39.    The Housing Inventory and Point-In-Time Counts are mandated by federal law and conducted nationwide utilizing methodologies developed with guidance from the U.S. Department of Housing & Urban Development (HUD).

40.    Information from the Housing Inventory and Point-In-Time Counts from Florida are submitted to the Florida Governor in the annual Florida Council on Homelessness Report and are also submitted to the U.S. Congress in the Annual Homeless Assessment Report.

41.    The Housing Inventory and Point-In-Time Counts utilize the federal definition of homelessness that defines a homeless individual as one who lacks a fixed, regular, and adequate night-time residence, or one who resides in a shelter, transitional housing, or a place not ordinarily used for sleeping accommodations, such as streets, automobiles, abandoned buildings, parks or other public spaces. Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2018).

42.    Neither the Housing Inventory nor the Point-In-Time Counts include homeless people who are staying with family or friends or those in institutions, such as jails, hospitals, or detox centers.

43.    According to the 2018 Point-In-Time Count, which was conducted on January 25, 2018, there were 572 homeless individuals living in Marion County (214 females and 358 males).

44.     Approximately 300 of those homeless individuals were in a shelter (167 were in an emergency shelter, and 133 were in a transitional shelter) and 271 remained unsheltered.

45.     The majority of the individuals who remained unsheltered were in adult-only homeless households with no children.

46.     There were 420 homeless households living in Marion County, 367 households without children, 38 households with at least one adult and one child and 15 households with only children.

47.     Of the 367 households without children, 97 individuals were housed in emergency shelters, 74 were in transitional housing and 198 remained unsheltered.

48.     According to the 2019 Point-In-Time Count, which was conducted on January 24, 2019, there were 475 homeless individuals living in Marion County.

49.     Approximately 296 of those homeless individuals were in a shelter— 170 were in an emergency shelter and 126 were in a transitional shelter— and 179 remained unsheltered.

50.     From 2017 to 2019, there has been an average of 295 unsheltered homeless individuals in Marion County and an average of 590 total homeless individuals experiencing homelessness.

***Shelter Bed Availability and Utilization***

51.     The Housing Inventory Count is composed of beds and units that are part of the Continuum of Care homeless assistance system that is dedicated to serving homeless individuals.

52.     The beds and units are categorized as emergency shelter, transitional housing, or permanent housing.

53.     An emergency shelter is "any facility, the primary purpose of which is to provide a temporary shelter for the homeless in general or for specific populations of the homeless and which does not require occupants to sign leases or occupancy agreements." 24 C.F.R. § 576.2.

54.     An emergency shelter that is considered "low barrier" is one that does not have requirements that result in screening people out of eligibility for services, such as excluding people from shelter who do not have a state-issued identification, do not have minimum income, do not have any criminal history, or do not have any substance abuse issues.

55.     The City of Ocala does not have any low-barrier shelters.

56.     An emergency shelter that is considered "high barrier" is one that has entry requirements that result in screening people out of eligibility for services.

57.     All of the City of Ocala's emergency shelters are high-barrier shelters.

58.     Transitional housing refers to housing with the purpose of moving "individuals and families experiencing homelessness to permanent housing within 24 months or such longer period as the [HUD] Secretary determines necessary." 42 U.S.C. § 11360(29).

59.     Permanent housing refers to "community-based housing without a designated length of stay, and includes both permanent supportive housing and permanent housing without supportive services." 42 U.S.C. § 11360(15).

60.     Beds and units that are counted in the Housing Inventory Count are further restricted by the population they serve, which in Ocala include youth males and females under 25 years old,  youth males under 25 years old, youth females under 25 years old, single females 18 years old or over, single males 18 years old or over, single males and females 18 years old or over, households with children, single females 18 years old and over and households with children, single males and females and households with children, domestic violence survivors, and veterans.

61.     According to the 2018 Housing Inventory Count, Marion County has 171 emergency shelter beds, 132 transitional housing units, and 177 permanent housing units.

62.     Of the 171 emergency shelter beds available in Ocala: 24 are reserved for youth males and females under 25 years old; 57 are reserved for single females 18 years old and over and households with children (41 of which are reserved for survivors of domestic violence); and 90 are reserved for single males and females and households with children.

63.     The majority of the emergency shelter beds are not available to the men and women without children who are unsheltered.

64.     There were only three emergency shelters available to single males and females 18 years old and over: Interfaith Emergency Services' Emergency Family Shelter; the Salvation Army's Red Shield Emergency Shelter; and the Salvation Army's Red Shield Weather Nights.

65. All three shelters are faith-based organizations. There are no secular shelters in the City.

66. The Interfaith Emergency Shelter has 15 beds year-round and also serves households with children.

67. The Interfaith Emergency Shelter is not a walk-in facility and only takes referrals from other agencies.

68. The Salvation Army Shelter also serves households with children.

69. Of the 75 beds available year round at the Salvation Army Shelter for the 2018 and 2019 Housing Inventory Counts, 13 are family beds reserved for households with children, and 62 are adult-only beds.

70. During the 2018 and 2019 Housing Inventory Counts, 100% of the adult-only emergency shelter beds were utilized at Salvation Army.

71. As of June 2019, the Salvation Army Shelter reported 40 emergency shelter beds reserved for adult men and 24 emergency shelter beds reserved for adult females.

72. The Salvation Army Shelter beds are only available for sleeping overnight.

73. The Salvation Army requires individuals to leave the shelter after breakfast is served in the morning and no later than 8:00 am.

74. The Salvation Army Shelter does not permit individuals to return to the shelter until dinner is served in the evening.

75.    Breakfast is served by the Salvation Army from 6:30-7:00 am and dinner is served at 5:00 pm.

76.    The Salvation Army Shelter is a high-barrier shelter.

77.    To be eligible for emergency shelter at the Salvation Army, an individual must have a valid government issued identification and pass a criminal background screening. For example, individuals with certain types of prior charges are not eligible to stay at the Salvation Army Shelter.

78.    The Salvation Army Shelter requires residents to comply with conduct rules while at the shelter and failure to do so will result in the person being exited from the shelter.

79.    The Salvation Army Shelter generally only allows people to stay for two weeks.

80.    If someone has previously been a resident at the Salvation Army shelter, they have to wait one year after their exit date to be eligible to stay at the overnight shelter again.

81.    The Salvation Army makes discretionary decisions to exclude individuals from services, such as persons with disabilities or medical conditions, or to trespass persons from the property.

82.    The Salvation Army has permanently trespassed more than 175 people from the premises, thereby making them ineligible for services.

83.     The Salvation Army Weather Shelter has 30 seasonal beds available, which means that these beds are only available on a planned basis, on specific dates during which higher demand is expected.

84.     The Salvation Army Weather Shelter is only open at the discretion of the shelter during extremely cold nights (when the temperature drops below 40 degrees Fahrenheit) and rainy nights.

85.     The Salvation Army loosens its regular admission criteria for homeless individuals seeking to access the Salvation Army Weather shelter at staff discretion.

86.     There is little capacity within Ocala's Continuum of Care to transition people from emergency shelter to permanent housing, resulting in people in Ocala cycling from short-term shelter stays (generally a maximum of two weeks per year) to being unsheltered again for a year, during which they are ineligible to return to shelter.

87.     The Homeless Council maintains a list of homeless individuals who have been screened and prioritized for housing assistance through a federally mandated coordinated assessment system.  As of July 2019, there are 136 individuals in Ocala's Continuum of Care who are considered to have the most risk, vulnerability, or need for access to permanent housing assistance based on scores calculated by a screening assessment. There is not enough permanent housing in Ocala's Continuum of Care to meet the needs of the individuals who have been determined to have top priority for housing assistance.

88.     There is not enough permanent housing or emergency shelter to meet the needs of homeless individuals in Ocala.

89.     Because they lack housing and cannot access the homeless shelters year-round, Named Plaintiffs and class members have no choice but to sleep outside on public or private property for most of the year if not year-round.

90.     The number of homeless class members exceeds the number of available emergency shelter beds on any given night.

91.     Even if Named Plaintiffs or class members meet the eligibility requirements and can practically access emergency shelter, due to limitations on the amount of time individuals are allowed to stay per year, homeless individuals in Ocala have no choice but to be unsheltered for most of the year.

***Life-Sustaining Conduct Essential to Human Survival***

92.     Shelter is one of the requirements of addressing a human being's basic physiological needs along with the need for food, water, air, and sleep.

93.     Sleep is critical for basic survival of human beings.

94.     Sleep is essential to a human being's health and well-being.

95.     Sleep helps human beings to balance hormones and other vital brain and body chemicals, as well as converting the day's experiences into usable permanent memory and cleansing the brain of toxic chemicals.

96.     Human beings have a sleep-wake rhythm that is repeated in a 24-hour cycle. While everyone's sleep needs vary, most adult human beings are built for 16 hours of wakefulness and need approximately 8 hours of sleep per night.

97.    A human being's core body temperature, which also cycles along with the sleep-wake rhythm, decreases during the nocturnal sleep phase and increases during the wake phase repeatedly in a 24-hour cycle.

98.    Higher or lower ambient temperatures may affect sleep and increase wakefulness for human beings.

99.    Consequences of sleep deprivation for human beings include mortality, morbidity, accidents and injuries, errors in judgment, decreases in functioning and quality of life, and health issues such as obesity, hypertension, diabetes, depression, heart attack, and stroke.

100.    Sleeping fewer than seven hours per night can have wide-ranging effects in the long-term on the cardiovascular, endocrine, immune, and nervous systems of human beings.

101.    Sleep disruptions that impact the continuity of sleep have substantial adverse short- and long-term health consequences.

102.    The need to sleep is so strong that at some point human beings will not be able to avoid sleep and will involuntarily fall asleep despite conscious efforts to stay awake.

103.    The use of bedding such as blankets or sleeping bags, clothing, and shelter during sleep is critical in supporting thermoregulation of the body temperature of human beings.

104.    Shelter is anything that can protect human beings from the elements.

105.    In the absence of access to indoor shelter, human beings need to be able to protect themselves from the elements like the hot sun, cold temperatures, wind, and rain.

106.    The City of Ocala experiences average high temperatures ranging in the 90s (degrees Fahrenheit) from May through September. July is on average the hottest month.

107.    The City of Ocala averages low temperatures in the 40s (degrees Fahrenheit) from December through February, and in the 50s (degrees Fahrenheit) in November, March, and April. January is on average the coldest month.

108.    The City of Ocala averages approximately 50 inches of rainfall per year. The highest average monthly rainfall occurs in June with 7.42 inches of rain. Ocala experiences an average of six or more inches of rain from June to September.

109.    Under certain circumstances, having the proper shelter can mean the difference between life and death for human beings.

110.    Without shelter, human skin and other organs can be damaged from exposure to the elements.

111.    Shelter, including a tent, tarp, or lean-to, is a way human beings can shelter themselves from the hot sun and create shade that provides cooler temperatures.

112.    Extreme heat is the leading cause of weather-related death for human beings in the United States.

113.    Because of subtropical conditions, Florida experiences warm annual temperatures that can reach levels harmful to human health.

114.    The health effects of temperature on humans in Florida is often compounded by humidity.

115.    Heat-related illness is a spectrum of symptoms experienced by human beings which result from the direct and indirect effects of heat including heat exhaustion, heat stroke, and dehydration.

116.    Individuals experiencing homelessness who do not have access to shelter are at increased risk of heat-related illnesses because they spend more time outdoors in hot places and lack access to water that could otherwise keep them cool and hydrated.

117.    Heat may also impact cardiovascular health, mental health and behavioral disorders, respiratory health, and other health systems including endocrine and renal function of human beings.

118.    Individuals experiencing homelessness who do not have access to shelter can be disproportionately vulnerable to the heat due to complications from other health conditions.

119.    Hypothermia is a condition that occurs when a person's core body temperature falls below 95 degrees Fahrenheit.

120.    Hypothermia is caused by exposure to cold temperatures and cold water, and commonly occurs when a person stays out in the cold for too long, does

not have appropriate clothing for the weather, or is not able to move to a warm, dry location.

121.    Even at a temperature of 50 degrees Fahrenheit, people can be at risk for hypothermia, especially in wet and windy weather.

122.    The symptoms of hypothermia include exhaustion, numbness, shivering, decreased hand coordination, slurred speech, and confusion, among other things.

123.    Hypothermia also commonly leads to heart, brain, and kidney malfunction, and sometimes death.

124.    A fire is one method human beings have used since prehistoric times to regulate body temperature on cold nights.

125.    Shelter, including a tent, tarp, or lean-to, is another way humans can stay dry and warm enough to survive cold temperatures even without a fire.

126.    Persons experiencing homelessness who do not have access to shelter are at risk of exposure to cold, wet, and windy weather which can cause hypothermia.

***The City's Open Lodging Ordinance***

127.    The City Council adopted an "open lodging" ordinance, codified at Sec. 42-10 of the Ocala City Code. (Ex. 1.) The ordinance's prohibitions against "lodging" or "sleeping" were originally adopted in 2002, and then amended in 2012 and 2015.

128.    The City Council sets final policy on the creation and adoption of City ordinances.

129.    The "open lodging" ordinance is an official policy of the City.

130.    "Lodge" is defined in Sec. 42-10(a)(1) of the Ocala City Code to mean "rest while awake or sleep" when one is:

    a.    "inside, on or near a tent or sleeping bag, or asleep atop or covered by materials (i.e., bedroll, cardboard, newspapers) or inside some form of temporary shelter; and/or

    b.    Near a campfire he or she has built; and/or

    c.    when awakened relates that he or she is otherwise homeless."

131.    The ordinance makes it unlawful "for any person at any time to lodge in the open on private property, in vacant lots, in or under any bridge or structure, in any railroad car, without owning the same or without permission of the owner or person entitled to possession of same." Sec. 42-10(b)(2), Ocala City Code.

132.    The ordinance makes it unlawful "for any person at any time to lodge in the open on public property, to include, but not limited to, government buildings, parks, sidewalks, public benches, or government owned right-of-way."   Sec. 42-10(b)(3), Ocala City Code.

133.    This prohibition against lodging on "public property" was added to the City's ordinance for the first time in 2015. Previously, the "open lodging" prohibitions only applied to private property.

134.    The ordinance further provides that "[m]erely sleeping in a place listed in subsection (b) of this section shall not be enough for a citation or arrest under this section. There must be one or more indicia of lodging, including but not limited to those listed in subsection (a)(1)." Sec. 42-10(c), Ocala City Code.

135.   If an individual is sleeping and is homeless (which is one of the indicia of lodging listed in subsection (a)(1) of the ordinance), that is considered by the City to be sufficient evidence of "unlawful lodging," and a person may be arrested for violations of the City's ordinance. No other "indicia of lodging" is required to make an arrest of an individual who is sleeping if they are also homeless.

136.   If an individual is sleeping, but is not homeless, that is not considered by the City to be sufficient evidence of the violation of "open lodging" absent some other "indicia of lodging."

137.   The City's ordinance prohibits sleeping 24 hours a day, 7 days a week, 365 days a year, if a person is homeless, on all property throughout the City— public or private.

138.   A person who is homeless is only allowed to sleep in the open on private property if they receive permission from the landowner or person entitled to possession of the property.

139.   Named Plaintiffs and putative class members who do not have access to fixed, adequate, and regular housing do not have anywhere in the City where they are allowed to sleep outside despite the lack of accessible alternative places to sleep that can accommodate all of the individuals experiencing homelessness in the City.

140.   Named Plaintiffs McArdle, Ramsey, and Cummings, and class members have been arrested for resting or sleeping outside while covered with blankets on nights when the temperature was near or below 50 degrees.

141.    Named Plaintiff McArdle and class members have been arrested for resting or sleeping under cover while it rains.

142.    The City's ordinance on its face, and how it is being applied, requires Named Plaintiffs and class members to choose between violating the ordinance or protecting themselves from harm.

143.    Named Plaintiffs McArdle, Ramsey, and Cummings, and class members have been arrested for resting or sleeping with their property in the open.

144.    Violations of the open lodging ordinance are punishable under the City's Code of ordinances by up to sixty days in jail and/or a fine of $500, plus additional costs and fees allowable by state law.

145.    The open lodging ordinance criminalizes the status of homelessness on its face by criminalizing the necessary, involuntary, life-sustaining conduct of sleeping.

146.    The open lodging ordinance criminalizes the status of homelessness in the manner in which it is being applied to Named Plaintiffs and putative class members who have an inability to conform their conduct because sleeping is an unavoidable consequence of all living human beings.

147.    Since the open lodging subpart was added to Ocala city ordinance 42-10 in 2002, 1,097 violations have been filed in Marion County Court.

148.    The City regularly makes full custodial arrests for open lodging and places Named Plaintiffs and class members in jail under pre-trial detention. The City does this despite the fact that a municipal ordinance violation is not considered a

"crime" under Florida law, and a full custodial arrest is unreasonable under Florida law for ordinances targeting innocent, non-criminal behavior.

149.    Named Plaintiffs and class members have been incarcerated and assessed more than $210,246.58 in fines, fees, and costs for violations of city ordinance 42-10 from January 2017 to May 2019. $27,203.52 was assessed for open lodging ordinance violations in 2017, $113,885.31 in 2018, and $69,157.75 from January to May 2019.

150.    The Clerk of Court and Marion County Court Judges, until August 2019, were suspending driver's licenses for failure to pay fines, fees, and costs assessed in these municipal ordinance cases. Named Plaintiffs and class members lost their driver's licenses as a result, impacting their ability to maintain stable employment.

### The City's "broken windows" policing operations

151.    The City is the legal entity responsible for the police department known as the City of Ocala Police Department. The Ocala Police Department has the traditional authority of police forces to enforce Florida statutes and City ordinances.

152.    The Ocala Police Chief is elected by the City Council and has supervision authority over police officers of the City.

153.    The Mayor of the City has charge and control of the Ocala Police Department and is responsible for the enforcement of all City ordinances (not relating to operation of public utilities).

154.    In September 2018, Mayor Kent Guinn publicly announced a policy of "broken windows" policing to focus on "quality of life" offenses.

155.    The City has policies, practices or customs of using "broken windows" policing to target persons experiencing homelessness through police operations like "Operation Street Sweeper," "zero tolerance" action plans, and enforcement of the City's "open lodging" and trespass policies.

156.    This "broken windows" policing is part of implementing Mayor Guinn's stated goal of ensuring that "the vagrants will be gone" from the downtown area.

157.    During the fall of 2018, Mayor Guinn informed the police chief that part of his plan is to "get rid of the homeless camps." He referenced the police department's "vagrant patrol" and directed the police chief to "turn them loose and let them get to work."

158.    Mayor Guinn takes an active role in implementing these policy goals by identifying homeless people he believes are committing "quality of life" offenses, photographing and investigating homeless people, and calling the police to respond to his identified concerns, such as asking the police to arrest homeless people and/or asking the police to trespass homeless people from locations such as the parking lot across from Salvation Army.

159.    As part of its "broken windows" policing policy, the City implemented operations starting in December of 2018 and continuing into 2019. The operations were targeted at "quality of life" violations and included "zero tolerance enforcement" action plans.

160.  The City's operations and action plans implemented during this time specifically focus on "quality of life" issues that include trespass, sleeping in public, loitering, and aggressive panhandling.

161.  The operations and action plans are conducted in geographic areas of the City where homeless services are located and where Named Plaintiffs and class members congregate or sleep.

162.  As part of Operation Street Sweeper, the City's officers perform routine security checks in the area of the Salvation Army homeless shelter.

163.  Sometimes during Operation Street Sweeper, officers go undercover and patrol in plain clothes.

164.  The City of Ocala Police Department tracked its arrests specific to Operation Street Sweeper.

165.  The City of Ocala Police Department tracked the locations of the arrests.

166.  The City of Ocala Police Department tracked the individuals whom they were arresting more than once as part of the operation.

167.  From the beginning of Operation Street Sweeper through April 1, 2019, the City made 223 arrests as part of its operation with 260 charges total. Eighty-seven of those arrests were for open lodging, 41 for panhandling, and 20 for trespassing.

168.  Some of the incident reports and case narratives created as part of Operation Street Sweeper did not document an arrest.

169.  Some of the incident reports and case narratives created as part of Operation Street Sweeper that did not document an arrest would document details of

individuals who were apprehended as part of the operation, such as that person's clothing, what the person looked like, items the person was carrying, statements the person made, and the direction the person was going in.

170.    Some of the incident reports and case narratives created as part of the operation that did not document an arrest would document the mode of transportation the apprehended person was taking, such as whether they were walking or what type of bicycle the person had.

171.    The City kept track of how many arrests and charges were made by patrol squads during the operation.

172.    The patrol squads were broken down into four groups: A days, A nights, B days, and B nights.

173.    As of December 31, 2018, patrol squad A days had arrested 14 individuals for a total of 16 charges, patrol squad B days had arrested 16 individuals with a total of 20 charges, patrol squad B days had arrested 11 individuals with a total of 11 charges, and patrol squad B nights had arrested 49 individuals with a total of 65 charges, for a total of 90 individuals with 111 charges.

174.    Captain Charlie Eades of the Police Department informed Lieutenant Buchbinder that his squad, the patrol squad B nights, "took this Operation seriously and outworked the other 3 patrol squads combined."

175.    Captain Eades informed Chief of Police Greg Graham that patrol squad B nights "knocked it out of the park."

176.    As part of Operation Street Sweeper, on December 6, 2018, an Ocala police officer apprehended a class member who was sleeping outside on a sheet on the west side of 428 NE 8th Ave.

177.    The police officer issued a verbal trespass warning to the individual but did not arrest him.

178.    Because the officer gave the individual a verbal trespass warning but did not arrest, the officer received "an information lecture" from a supervising officer on why he should have arrested the individual "due to having a zero tolerance policy for open lodging."

179.    Since Mayor Guinn announced the City's policy of "broken windows" policing in September 2018, there have been 237 cases charging violations of the City's open lodging ordinance filed in Marion County Court. Prior to the implementation of this policy, 24 cases of open lodging were filed in 2015, 37 in 2016, 46 in 2017, and 53 from January to September 2018.

180.    Due to the City's "zero tolerance" approach of actively searching and arresting persons violating the City's "open lodging" ordinance, Named Plaintiffs and class members experience the daily stress of having to find places out of public view where they can hide and rest or sleep. This causes Named Plaintiffs and class members emotional distress and fear, and it forces them into places away from other homeless individuals where they are less visible and farther away from services and meal locations. Individuals experiencing homelessness have been forced to leave the

City altogether, or even leave the City on a nightly basis, in the search of a location where they are lawfully allowed to lay down to sleep.

***The City's Trespass Policy***

181.   The City has a policy, practice, or custom of authorizing City employees including park rangers and police officers to issue trespass warnings excluding individuals from public places in the City, including public parks during times when those parks are otherwise open to the public.

182.   Through this official policy, practice or custom of the City, the City has delegated authority to City employees including park rangers and police officers to issue trespass warnings based on their sole discretion, for any purpose, and without any form of review.

183.   The City does not have an ordinance or a written policy governing issuance of trespass warnings for public property to provide the public with notice or to guide employee discretion as to what type of conduct triggers issuance of trespass warnings, criteria for issuing trespass warnings, or determination of geographic scope or duration of trespass warnings.

184.   City employees including park rangers and police officers have utilized this authority to issue trespass warnings to exclude Named Plaintiffs and class members from public property (including public parks) permanently.

185.   Named Plaintiffs McArdle, Cummings, and Ramsey and class members have been issued trespass warnings by City police officers excluding them from public

parks but were not arrested and/or were never charged with any crimes at the time the trespass warning was issued.

186.   The City does not have a policy that provides a process by which an individual may challenge a trespass warning banning them from public property that was issued by City employees including park rangers and police officers.

187.   Named Plaintiffs and class members who are issued trespass warnings for public property including public parks in the City of Ocala are not provided with written notice of an opportunity to challenge the trespass warning. The written notice also does not provide a reason the person is issued a trespass warning.

188.   Entering public property or a public park in violation of a trespass warning issued by the City of Ocala can result in an arrest for violation of Florida's trespass after warning statute, § 810.09, Florida Stat. (2019).

189.   A trespass warning that excludes an individual from a public park or other public space allows officers to arrest individuals for mere physical presence in a public place under circumstances when members of the general public are otherwise allowed to be there.

190.   Named Plaintiff McArdle and at least 80 other individuals have been trespassed from the Downtown Square through issuance of a written trespass warning.

191.   Named Plaintiff Ramsey has been verbally trespassed from the Downtown Square, but did not receive a written warning.

192.    Ocala's Downtown Square is the center of the historic district and is a gathering place for the community that is open to the public.

193.    Named Plaintiffs McArdle, Ramsey, and Cummings, and at least 225 other individuals have been trespassed from Tuscawilla Park by the City through issuance of a written trespass warning.

194.    Tuscawilla Park is a public park owned by the City. It is a large open green space surrounding a lake near the downtown area of the City. It includes recreation facilities, bathrooms, trails, and recreation areas. The trails are open from sunrise to sunset and the lighted areas are open until 10:00 pm.

195.    Tuscawilla Park is surrounded by City streets and has several City streets and public sidewalks that run through the green spaces of the park and are open to the public.

196.    Public parks are some of the only available places in the City where individuals experiencing homelessness are allowed to be. Trespass warnings excluding them from those parks burden the ability of Named Plaintiffs and class members to move freely throughout the City. Those individuals have limited options to conform their conduct to find public places in the City where they are lawfully allowed to be.

**Named Plaintiff Allegations**

197.    Named Plaintiffs have spent 210 days in the Marion County Jail and were assessed $9,106 as a result of the City's enforcement of its "open lodging" ordinance and practice of trespassing homeless individuals from public places.

34

198.    Named Plaintiffs and class members have experienced injury in the form of loss of protected freedoms, loss of liberty, and emotional distress as they are unable to find places in the City where they are lawfully allowed to exist and engage in sleeping or resting which is universal and unavoidable conduct for all human beings.

199.    Without an injunction, the City will continue to arrest, cite, trespass or otherwise enforce the unlawful policies, practices or customs of the City against Named Plaintiffs and class members.

***Patrick McArdle***

200.    Named Plaintiff Patrick McArdle is ineligible for emergency shelter at the Salvation Army due to a prior battery charge on his record.

201.    McArdle was also trespassed from the Salvation Army on July 14, 2017.

202.    The trespass warning McArdle received was permanent.

203.    From July 2017 until around April 2019, McArdle was not able to access the Salvation Army for meal services.

204.    McArdle recently applied to have the trespass lifted. While he has been granted permission by the Salvation Army to receive hot meals and shower at the Salvation Army, the trespass remains in place, putting him at risk of arbitrary arrest should he choose to access these services.

205.    McArdle has been arrested for "open lodging" on ten occasions. He has spent 148 days in the Marion County Jail and was assessed a total of $3,690.50 in fines, fees, and costs because he is a homeless individual in Ocala who has no choice but to sleep in the open.

206.    At 11:10 pm on July 8, 2016, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sleeping outside of 112 North Magnolia Avenue and, upon waking, stated to officers that he was homeless. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to 11 days in jail and assessed $898.50 in fines, fees, and costs.

207.    At least six homeless individuals including McArdle were arrested for "open lodging" in Ocala between 10:00 pm on July 8, 2016 and 9:00 am on July 9, 2016.

208.    At 12:32 am on September 1, 2016, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sleeping behind bushes and a concrete barrier at 121 NW 3rd Street. He was laying his head on a plastic bag of clothing. Upon questioning by officers, McArdle advised he was homeless. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to three days in jail and assessed $498.50 in fines, fees, and costs.

209.    At 1:30 pm on September 12, 2016, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sleeping on a sidewalk at 351 NE 8th Avenue. Upon waking, he confirmed to officers he was homeless. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to 30 days in jail and assessed $301 in fines, fees, and costs concurrent with another charge.

210.    The Salvation Army is not open for shelter at 1:30 pm, even for individuals who otherwise meet the eligibility requirements to stay there.

211.    At 3:52 am on July 15, 2017, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sitting on a bench on the corner of North Magnolia and NW 2nd Street, slouched over, asleep. McArdle pled guilty to lodging or sleeping in the open. McArdle was sentenced to 71 days in jail and assessed $623 in fines, fees, and costs concurrent with another charge.

212.    At 5:14 pm on August 26, 2017, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was lying on his back in a grassy area in the Churchill Square shopping center, and appeared to be asleep. Officers knew him to be currently homeless. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to 60 days in jail and assessed $283 in fines, fees, and costs.

213.    At 11:47 pm on July 2, 2018, McArdle was arrested for "open lodging" in violation of city ordinance 42-10.The arrest affidavit states that McArdle was sleeping under a covered alcove in a parking lot at the Quad County Treatment Center. Upon questioning by officers, McArdle advised he was homeless. McArdle pled nolo contendre to lodging or sleeping in the open. He was sentenced to three days in jail and assessed $296 in fines, fees, and costs.

214.    There was over a half-inch of precipitation in Ocala on July 2, 2018.

215.    At 6:23 am on August 14, 2018, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sleeping behind a fence next to a picnic table on the grounds of the Marion County

School Board building. The officer reported that McArdle was using a bag of clothing as a "pillow." Upon questioning by officers, the officers alleged that McArdle stated he was homeless. McArdle pled nolo contendre to lodging or sleeping in the open. He was sentenced to four days in jail and assessed $506.50 in fines, fees, and costs.

216.   At 10:28 pm on January 15, 2019, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. The arrest affidavit states that McArdle was sleeping on the floor of the Spin City Laundry and using his jacket as a cover. Upon questioning by officers, McArdle stated he was homeless. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to 28 days in jail and assessed $419.50 in fines, fees, and costs.

217.   The temperature reached as low as 48 degrees on January 15, 2019.

218.   At 11:49 pm on February 15, 2019, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, McArdle was sleeping with blankets on a sleeping bag in a vacant lot on North Magnolia Avenue. McArdle pled guilty to lodging or sleeping in the open. He was sentenced to seven days in jail and assessed $419.50 in fines, fees, and costs.

219.   The temperature reached lows of 48 degrees in Ocala on February 15, 2019.

220.   At least 4 individuals including McArdle were arrested for "open lodging" in Ocala between 10:00 pm on February 15, 2019 and 9:00 am on February 16, 2019.

221.   At 1:30 am on February 27, 2019, McArdle was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, McArdle

was laying on the ground, curled up in a ball, against the train station at 531 NE 1st Avenue. The arrest affidavit states that McArdle was using a bag full of his belongings as a "pillow." McArdle pled nolo contendre to lodging or sleeping in the open and his adjudication was withheld. He was sentenced to two days in jail and assessed $68 in fines, fees, and costs.

222.   McArdle has been stopped by the Ocala police at least four times as a part of Operation Street Sweeper while in the geographic locations targeted by this operation.

223.   At 3:25 pm on December 3, 2018, McArdle and two other homeless individuals were standing on the sidewalk near the Salvation Army. The incident report indicates they were stopped by the Ocala police and interrogated for 49 minutes. The officers threatened all three individuals with trespass if they remained in the area.

224.   At 9:12 pm on December 6, 2018, McArdle and two other homeless individuals were hanging out behind the Quad County Treatment Center building. The incident report indicates they were stopped by the Ocala police and interrogated for over an hour. The offices issued trespass warnings to all three individuals.

225.   At 9:11 am on December 25, 2018, McArdle and two other homeless individuals were sitting on the front porch of an abandoned residence at 428 NE 8th Avenue. The incident report indicates they were stopped by the Ocala police and interrogated for 9 minutes. The officers told McArdle to leave the property and not to return.

226.    On December 28, 2018, McArdle was sitting at the intersection of NW 1st Avenue and NW 3rd Street waiting for a ride from his employer. The incident report indicates he was stopped by Ocala police and interrogated for 14 minutes.

227.    McArdle was issued a written trespass warning by the City on June 6, 2016, permanently banning him from all of Tuscawilla Park. He was not arrested for violating any state statute or City ordinance at the time. He was told by City police that he may not travel on city streets surrounding or running through the park (the city streets of NE Watula Avenue and NE Sanchez Avenue in between NE 3rd Street and NE 9th Street).

228.    McArdle was issued a written trespass warning by the City on June 30, 2016, permanently banning him from the City's Downtown Square. He was not arrested for violating any state statute or City ordinance at the time.

229.    McArdle was not provided with notice of the right to challenge these trespass warnings or provided a hearing process to challenge the trespass warnings issued to him for Tuscawilla Park or the Downtown Square. He had no way, and continues to have no way, to challenge the basis for the ban, the time frame for the ban, or the geographic scope of the ban.

230.    McArdle wishes to visit these public places under ordinary conditions that other members of the public visit those places, but due to the City's actions he has been permanently deprived of his liberty interest to visit public places of his choosing.

231.    McArdle has been arrested for trespass after warning for violating these trespass warnings.

232.    At 11:45 am on August 3, 2016, McArdle was arrested at Tuscawilla Park for trespass after warning in violation of § 810.09, Fla. Stat. (2019). According to the arrest affidavit, police had responded to a report of "suspicious males in the park." McArdle pled guilty to trespass after warning. He was sentenced to 30 days in jail and assessed $1,786 in fines, fees, and costs.

233.    At 8:48 pm on October 13, 2016, McArdle was arrested at Tuscawilla Park for trespass after warning in violation of § 810.09, Fla. Stat. (2019). According to the arrest affidavit, McArdle was sitting on the curb near NE 4th Street and Sanchez Avenue. These charges were dropped on November 7, 2016, after the state's attorney filed an announcement of no information. McArdle spent approximately 25 days in the Marion County Jail before the charges were dismissed.

234.    At 12:10 pm on September 25, 2018, McArdle was arrested at Tuscawilla Park for trespass after warning in violation of § 810.09, Fla. Stat. (2019). According to the arrest affidavit, McArdle was using the restroom on the north side of the baseball field. McArdle pled guilty to trespass after warning. He was sentenced to ten days in jail and assessed $786 in fines, fees, and costs.

235.    McArdle is required to forfeit his right to visit public places in the City from where he has been excluded to avoid future arrest for trespass after warning.

### *Courtney Ramsey*

236.    Named Plaintiff Courtney Ramsey has accessed emergency shelter services at the Salvation Army.

237.    Ramsey lived at the Salvation Army for approximately 4 weeks in 2018.

238.    Ramsey was exited from the Salvation Army shelter in August 2018 because she arrived late to check in.

239.    After Ramsey was exited from the Salvation Army shelter, she was told she could not return for shelter services for one year.

240.    Ramsey has been able to access the Salvation Army for cold night services approximately five times since her exit in August 2018.

241.    Ramsey re-applied for shelter services at the Salvation Army after her exit in August 2018 but was denied.

242.    Ramsey has applied for shelter at the Interfaith shelter for women and families but was denied because she suffers from a seizure disorder.

243.    Ramsey was permitted to return to the Salvation Army around July 2019.

244.    Ramsey was trespassed from the Salvation Army on August 3, 2019, and can no longer access shelter beds there.

245.    Ramsey has been arrested for "open lodging" on six occasions. She has spent 50 days in the Marion County Jail and was assessed a total of $4,195.50 in fines, fees, and costs because she is a homeless individual in Ocala who has no choice but to sleep in the open.

246.   At 1:11 pm on March 10, 2018, Ramsey was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey was sleeping wrapped in blankets near the intersection of NE 8th Avenue and NE 4th Street. The arrest affidavit states that upon waking, she stated to officers that she was homeless. Ramsey pled guilty to lodging or sleeping in the open. She was sentenced to ten days in jail and assessed $963.50 in fines, fees, and costs.

247.   The Salvation Army is not open for shelter at 1:11 pm.

248.   While the high temperature in Ocala on March 10, 2018, was 71 degrees, the temperature also reached lows of 35 degrees on that date.

249.   At 11:46 pm on June 28, 2018, Ramsey was arrested for open lodging in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey was sleeping on her book bag as a "pillow" under the curtilage of a business located at 401 SW 1st Avenue. The arrest affidavit states that upon waking, she stated to officers that she was homeless and that she had tried to stay at the Salvation Army but that they were full. Ramsey pled guilty to lodging or sleeping in the open. She was sentenced to three days in jail and assessed $322.25 in fines, fees, and costs.

250.   At 10:15 am on October 9, 2018, Ramsey was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey was sleeping near a dumpster located at 3019 SW 27th Avenue. The arrest affidavit reports that upon waking, she stated to officers that she was homeless and had fallen asleep there because she had nowhere else to go. Ramsey pled guilty to lodging or

sleeping in the open. She was sentenced to seven days in jail and assessed $722.25 in fines, fees, and costs.

251.   The Salvation Army is not open for shelter at 10:15 am.

252.   At 7:20 am on October 31, 2018, Ramsey was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey was sleeping on a sidewalk across the street from the Salvation Army. The arrest affidavit states that she was lying on top of a pair of jeans and using a backpack as a "pillow." Ramsey pled guilty to lodging or sleeping in the open. She was sentenced to 17 days in jail and assessed $1,118.50 in fines, fees, and costs.

253.   The Salvation Army is not open for shelter at 7:20 am.

254.   At least two individuals including Ramsey were arrested for "open lodging" in Ocala between 10:00 pm on October 31, 2018, and 9:00 am on November 1, 2018.

255.   At 12:36 am on November 24, 2018, Ramsey was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey, along with another homeless individual, was sleeping on a porch located at 615 East State Road 40. The arrest affidavit states that the two were sleeping underneath a blanket and utilizing a backpack and another blanket as a "pillow." The officers reported that Ramsey stated she was homeless when questioned. Ramsey pled guilty to lodging or sleeping in the open. She was sentenced to ten days in jail and assessed $796 in fines, fees, and costs.

256.   At least two individuals including Ramsey were arrested for "open lodging" in Ocala between 10:00 pm on November 24, 2018 and 9:00 am on November 25, 2018.

257.   At 12:28 am on December 8, 2018, Ramsey was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Ramsey, along with another homeless individual, was resting on a concrete slab under the N. Pine Avenue overpass bridge. The arrest affidavit states that the two were covered by a cloth blanket. Ramsey also had multiple bags of personal belongings and clothing and a pink bicycle. The officers reported that Ramsey stated she was homeless when questioned. Ramsey pled guilty to lodging or sleeping in the open and her adjudication was withheld. She was sentenced to three days in jail and assessed $273 in fines, fees, and costs.

258.   The temperature reached lows of 51 degrees in Ocala on December 8, 2018.

259.   Ramsey has been stopped by the Ocala police as a part of Operation Street Sweeper while in the geographic locations targeted by this operation.

260.   At 4:06 pm on December 7, 2018, Ramsey was sitting on the sidewalk across the street from the Salvation Army with another homeless individual. The incident report indicates she was stopped by Ocala police and interrogated. The officer told Ramsey she could not sit on the sidewalk and block foot traffic.

261.   Ramsey was issued a written trespass warning by the City on May 10, 2018, permanently banning her from all of Tuscawilla Park. Ramsey has also been given a verbal trespass warning for Downtown Square by the City.

262.   Ramsey was not provided with notice of the right to challenge these trespass warnings or provided a hearing process to challenge the trespass warnings issued to her for public places in the City. Ramsey had no way, and continues to have no way, to challenge the basis for the ban, the time frame for the ban, or the geographic scope of the ban.

263.   Ramsey wishes to visit the public places in the City where she has been excluded under ordinary conditions that other members of the public visit those places. Due to the City's actions, she has been permanently deprived of her liberty to visit public places of her choosing.

264.   Ramsey is required to forfeit her right to visit public places in the City to avoid future arrest for trespass after warning due to the City's actions.

**Anthony Cummings**

265.   Named Plaintiff Anthony Cummings has been arrested for "open lodging" on three occasions. He has spent 12 nights in the Marion County Jail and was assessed a total of $1,220 in fines, fees, and costs because he is a homeless individual in Ocala who has no access to housing or indoor shelter year-round.

266.   Cummings was arrested for open lodging on January 13, 2012. He pled guilty and was sentenced to two days in jail and assessed $273.

267.    At 1:48am on April 5, 2016, Cummings was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Cummings was sleeping in the rear patio of a business located at 333 NW 3rd Avenue. The arrest affidavit states that he was laying on a piece of cardboard, using his backpack as a "pillow" and covered in a blue blanket. Cummings pled guilty to lodging or sleeping in the open. He was sentenced to five days in jail and assessed $348.50 in fines, fees, and costs.

268.    The temperature reached lows of 50 degrees in Ocala on April 5, 2016.

269.    At 12:18 am on July 18, 2016, Cummings was arrested for "open lodging" in violation of city ordinance 42-10. According to the arrest affidavit, Cummings was sleeping on the sidewalk of NW 1st Avenue. The arrest affidavit states that Cummings was sleeping on his backpack. The officers reported that Cummings stated he lived "on the streets" when questioned. Cummings pled guilty to lodging or sleeping in the open. He was sentenced to five days in jail and assessed $598.50 in fines, fees, and costs.

270.    Cummings has been stopped by Ocala police three times as a part of Operation Street Sweeper while in the geographic locations targeted by this operation.

271.    At 9:19 am on December 3, 2018, Cummings was crossing the railroad tracks by foot. The incident report indicates he was stopped and interrogated by the Ocala police for 17 minutes.

272.    At 10:54 am on December 10, 2018, Cummings and another homeless individual were traveling south on NW 4th Avenue on the way to the Interfaith Soup

Kitchen. The incident report indicates they were stopped and interrogated by Ocala police for 15 minutes.

273.    At 4:10 pm on December 22, 2018, Cummings was one of a group of homeless individuals gathered outside of the Salvation Army. Cummings was sitting by a fence with a backpack. The incident report indicates he was stopped and interrogated by police. At least 11 other homeless individuals were also stopped and interrogated by Ocala police. They were told that sitting on the sidewalk and having their belongings on the ground were violations. They were also told that, if eating dinner at the Salvation Army, they would need to wait to arrive when food was being served.

274.    Cummings was issued a trespass warning by the City banning him from returning to Tuscawilla Park on October 3, 2016. He was not arrested for violating any state statute or City ordinance at the time.

275.    Due to the issuance of this trespass warning by the City, Cummings is permanently banned from returning to the park under the ordinary conditions that other members of the public can access the park.

276.    Cummings was not provided with notice of the right to challenge these trespass warnings or provided a hearing process to challenge the trespass warnings issued to him for public places in the City. He had no way, and continues to have no way, to challenge the basis for the ban, the time frame for the ban, or the geographic scope of the ban.

277.    At 5:12 pm on February 25, 2018, Cummings was arrested at Tuscawilla Park for trespass after warning in violation of § 810.09, Fla. Stat. (2018). According to the arrest affidavit, Cummings was sleeping under a tree in the park. Cummings pled guilty to trespass after warning. He was sentenced to 15 days in jail and assessed $378 in fines, fees, and costs.

278.    As a result of his arrest for trespass after warning in Tuscawilla Park, Cummings lost his driver's license. When he was unable to pay $378 in fines, fees, and costs, Cummings' driver's license was suspended for over a year. Having a suspended driver's license impacted Cummings' ability to obtain stable employment.

279.    Cummings is required to forfeit his right to visit public places in the City due to the City's actions in issuing the ban excluding him from the park to avoid future arrest for trespass after warning.

**FIRST CLAIM FOR RELIEF**
**EIGHTH AMENDMENT**
**42 U.S.C. §1983**

280.    Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

281.    The City's open lodging ordinance, on its face and as-applied to Named Plaintiffs and class members, is an unconstitutional infringement of Plaintiffs' right to be free of cruel or unusual punishment in violation of the Eighth Amendment.

282.    It is beyond the power of the government to punish individuals based on their involuntary status as homeless persons.

283. The City's "open lodging" ordinance on its face criminalizes "sleeping" or "resting while awake" if the individual is "homeless." No other conduct is required to convict someone of this crime.

284. The City's ordinance on its face criminalizes sleeping *per se* only if an individual is homeless. If an individual is not homeless, then sleeping alone is not enough to convict of the crime.

285. Sleeping and resting are universal and unavoidable consequences of being human.

286. Sleeping is a life sustaining activity for all human beings which means it must occur at some time and in some place.

287. The City's ordinance criminalizes sleeping 24 hours a day on all public property and private property (if the individual does not have permission).

288. The City's ordinance punishes sleeping only if an individual has no choice (because they are homeless) but allows sleeping in public places if the individual has a choice (because they are not homeless).

289. Shelter space is unavailable in the City of Ocala because there is an inadequate number of beds to meet the needs of the entire homeless population and there are restrictions on those beds that disqualify certain groups of homeless individuals (e.g., exceeding maximum stay requirements).

290. Because of the unavailability of low-income housing or alternative shelter, plaintiffs and class members have no choice but to conduct involuntary and unavoidable life-sustaining activities such as sleeping or resting in public places.

291.    Named Plaintiffs and class members are human beings who require sleep and rest every night. When Named Plaintiffs and class members do not have access to indoor shelter, they will need to sleep in an outdoor area somewhere in the City.

292.    The harmless conduct for which plaintiffs are being arrested under the City's "open lodging" ordinance is inseparable from their involuntary condition of being homeless. When adequate shelter space does not exist, there is no meaningful distinction between the status of being homeless and the conduct of sleeping in public.

293.    Arresting homeless people for harmless, life-sustaining acts like sleeping, which they are forced to perform in public, punishes them for being homeless and for being human beings who require sleep.

294.    Forcing homeless individuals from public parks and streets, and from sheltered areas deprives homeless individuals of a place to sleep, of minimal safety, and of cover from the elements.

295.    Since conforming one's conduct to the City's "open lodging" ordinance is impossible for human beings who are homeless (and have no place in the City where they are lawfully allowed to sleep), the City's enforcement of the ordinance amounts to criminalization of homelessness in violation of the Eighth Amendment.

296.    Named Plaintiffs and class members have been criminally punished through arrest, incarceration, and assessment of thousands of dollars in fines, fees, and costs due to the City's enforcement of its "open lodging" ordinance.

297.    As a direct and proximate result of the City's enforcement of its "open lodging" ordinance, Named Plaintiffs and class members have suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### FOURTEENTH AMENDMENT - VAGUENESS
### 42 U.S.C. §1983

298.    Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

299.    The City's "open lodging" ordinance, on its face and as-applied to Named Plaintiffs and class members, is an unconstitutional infringement of Plaintiffs' affirmative rights to due process of law, a right guaranteed by the Fourteenth Amendment of the U.S. Constitution.

300.    The City's "open lodging" ordinance is void for vagueness.

301.    The language of the "open lodging" ordinance does not convey a sufficiently definite warning as to the proscribed conduct so that the ordinary person can understand what acts and/or behaviors are unlawful. There is no distinction drawn between conduct that is calculated to harm and that which is essentially innocent.

302.    The City's "open lodging" ordinance and the manner in which it is being applied to Named Plaintiffs and class members fails to provide constitutionally sufficient notice prior to depriving Named Plaintiffs and class members of their liberty interests in resting, sleeping, and seeking shelter from the elements, such that a reasonable homeless person in Ocala would understand what conduct is prohibited.

303.    The ordinance does not define the term "resting while awake," which is inherently innocent conduct that is not constitutionally punishable as a crime. Individuals do not have fair notice that "resting while awake" is punishable, and the expanse of innocent human behavior that can be criminalized by this ordinance is limitless, lending itself to arbitrary and discriminatory enforcement by the police.

304.    The City's open lodging ordinance on its face criminalizes "sleeping" or "resting while awake" if the individual is "homeless." No other conduct is required to convict someone of this crime.

305.    The ordinance is a generalized "vagrancy" standard, allowing police officers to arrest and haul Named Plaintiffs and class members off to jail because they are human beings who require sleep and rest to survive and therefore have no ability to avoid being ensnared in this net designed to catch them.

306.    Even-handed enforcement of the terms of the ordinance is impossible because the ordinance's overbroad and vague terms are designed to catch only homeless people within its reach at the whim of individual police officers.

307.    The ordinance's terms are vague as to what conduct constitutes "indicia of lodging," which does not provide adequate standards of enforceability to safeguard against arbitrary and discriminatory enforcement. The clause "included but not limited to" indicates there is a potentially unlimited scope of conduct that could constitute lodging. This failure to establish minimal guidelines to govern law enforcement allows Ocala police officers unbridled discretion to determine when a violation of open lodging has occurred.

308.    The definitions of the "indicia of lodging" are vague. For example, if a person is "resting while awake" or "sleeping" and is "inside, on, or near a tent or sleeping bag, or asleep atop or covered by materials (i.e. bedroll, cardboard, newspapers) or inside some form of temporary shelter," that constitutes the crime of "open lodging." This standard of conduct sweeps into its ambit a virtually unlimited list of prohibited behaviors that are inherently innocent conduct that is not constitutionally punished as a crime.

309.    For example, sitting on a blanket in a public place and "resting while awake" is punishable as "unlawful lodging" and it has been applied in this way by law enforcement officers to arrest and jail Named Plaintiff Ramsey and class members for conduct that other housed residents of the City of Ocala do every day as part of their enjoyment of public parks.

310.    As another example, law enforcement officers have interpreted this provision to prohibit Named Plaintiffs McArdle, Ramsey, and Cummings, and class members from sleeping or resting while awake while laying their heads on a backpack or bag that contains their personal belongings. No one could have adequate notice that this inherently innocent conduct is a crime, leading to arbitrary and discriminatory enforcement.

311.    As another example, law enforcement officers have interpreted this provision to prohibit Named Plaintiff McArdle and class members from sleeping or resting while awake while wearing jackets or multiple layers of clothing. No one could

have adequate notice that this inherently innocent conduct is a crime, leading to arbitrary and discriminatory enforcement.

312.   As another example, law enforcement officers have interpreted this provision to prohibit Named Plaintiffs Ramsey and Cummings, and class members from sleeping or resting while awake on clothing or other materials such as cardboard that are providing protection from a damp or dirty ground. No one could have adequate notice that this inherently innocent conduct is a crime, leading to arbitrary and discriminatory enforcement.

313.   As another example, law enforcement officers have interpreted this provision to prohibit Named Plaintiffs McArdle, Ramsey and Cummings, and class members from sleeping or resting while awake when near a bush or an overhang from a building that is providing shelter from the elements. They did not erect a temporary shelter but are merely physically occupying space near physical structures that already exist, and are punished for the crime of "unlawful lodging" for doing so. No one could have adequate notice that this inherently innocent conduct is a crime, leading to arbitrary and discriminatory enforcement.

314.   Named Plaintiff McArdle was arrested for sleeping while sitting upright on a bench on public property.

315.   Named Plaintiffs and class members have been told by the City police that simply sitting near their personal belongings in public was enough to violate the open lodging ordinance.

316.    The law has been applied in an arbitrary and discriminatory manner to Named Plaintiffs McArdle, Ramsey, and Cummings. The law has been similarly applied in an arbitrary and discriminatory manner to class members.

317.    Forcing homeless individuals from public parks, streets, and from sheltered areas deprives homeless individuals of their liberty interests in resting or sleeping with minimal safety and shelter from the elements.

318.    The vague portions of the ordinance are so inherent to the meaning that they are not severable. The entire ordinance should be stricken.

319.    Named Plaintiffs and class members have been criminally punished through arrest, incarceration, and assessment of thousands of dollars in fines, fees, and costs due to the City's arbitrary and discriminatory enforcement of its open lodging ordinance.

320.    As a direct and proximate result of the City's enforcement of the open lodging ordinance, Named Plaintiffs and class members have suffered and will continue to suffer irreparable harm.

**THIRD CLAIM FOR RELIEF**
**FOURTEENTH AMENDMENT – SUBSTANTIVE DUE PROCESS**
**42 U.S.C. §1983**

321.    Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

322.    The City's open lodging ordinance is a violation, on its face and as-applied to Named Plaintiffs and class members, of the affirmative right to substantive due process.

323.    Substantive due process protects individuals against certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.

324.    The City is using its open lodging ordinance to arrest and incarcerate homeless individuals for sleeping or resting while awake because they are also homeless.

325.    The City's ordinance provides no opportunity for a homeless person to comply with its prohibitions. The City enforces the ordinance even though shelter is unavailable because the number of homeless people exceeds the availability of shelter space. The City also enforces the ordinance against individuals who have no ability to access shelter because shelters are not open during times of enforcement, or individuals are otherwise excluded due to high-barrier admission requirements or trespass warnings.

326.    The City's ordinance outlaws sleeping *per se* if the individual is homeless.

327.    The City's ordinance outlaws resting while awake *per se* if the individual is homeless.

328.    Revealing the City's lack of a legitimate governmental objective, sleeping is not enough to arrest for the crime of open lodging if the individual is not homeless. However, if an individual is homeless then sleeping is prohibited. The City's ordinance therefore punishes people who have no alternative places to sleep while

allowing the same conduct to occur for people who have access to housing and the opportunity to conform their conduct.

329.   The City's enforcement of this ordinance against Named Plaintiffs and class members deprives homeless individuals of their liberty interest in conducting life-sustaining conduct essential for basic human survival including resting, sleeping, and protecting themselves from the elements.

330.   There is no reasonable and substantial relation to a legitimate government objective.

331.   Named Plaintiffs and class members have been criminally punished through arrest, incarceration, and assessment of thousands of dollars in fines, fees, and costs due to the City's enforcement of its "open lodging" ordinance.

332.   As a direct and proximate result of the City's enforcement of the "open lodging" ordinance, Named Plaintiffs and class members have suffered and will continue to suffer irreparable harm.

## FOURTH CLAIM FOR RELIEF
## FOURTEENTH AMENDMENT – PROCEDURAL DUE PROCESS
## 42 U.S.C. §1983

333.   Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

334.   Named Plaintiffs and class members have a constitutionally protected liberty interest to be in public places of their choosing, including all public parks and the downtown square in the City of Ocala.

335.    The City has a policy, practice, or custom of authorizing Ocala police officers and other City officials to issue trespass warnings to individuals for City-owned parks without providing an opportunity for a hearing or notice of a right to a hearing.

336.    The issuance of these trespass warnings operate as a type of restraining injunction (though not issued by a court) prohibiting individuals from re-entering public parks under times and conditions when those parks are ordinarily open to members of the public. If an individual who has been issued such a warning re-enters a public park, that person is subject to future arrest for trespass after warning.

337.    The permanent trespass warnings issued to Named Plaintiffs McArdle, Ramsey, and Cummings, and class members by the City prohibit them from returning to public parks or the downtown square. This state action deprives them of a constitutionally protected liberty interest to be in public places of their choosing.

338.    The trespass warnings the City issued to Named Plaintiffs McArdle, Ramsey, and Cummings, and to class members, violated their procedural due process rights because the City fails to provide an opportunity to be heard to challenge the trespass warnings.

339.    Named Plaintiffs McArdle, Ramsey, and Cummings, and to class members have been permanently excluded from public places including public parks due to the City's actions taken in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

340.    Named Plaintiffs McArdle, Ramsey, and Cummings, and class members, have to either forfeit their constitutionally protected right to enter public

places of their choosing or risk arrest and face additional criminal penalties including incarceration and the imposition of fines, fees, and costs.

341.    Named Plaintiffs McArdle and Cummings have been arrested for trespass after warning for visiting public parks in violation of their trespass warning, being punished with jail time, fines, fees, and costs for their physical presence in public places where other members of the public lawfully are allowed to be.

342.    As a direct and proximate result of the City's trespass policy, Named Plaintiffs McArdle, Ramsey, and Cummings, and class members, have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**FOURTEENTH AMENDMENT – EQUAL PROTECTION**
**42 U.S.C. §1983**

343.    Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

344.    The City's policy of "broken windows" policing and implementation of related police operations such as "Operation Street Sweeper" and enforcement of the City's open lodging ordinance is an unconstitutional infringement, on its face and as applied, of the Named Plaintiffs and class members affirmative rights to Equal Protection under the Fourteenth Amendment of the U.S. Constitution.

345.    The City's policy of "broken windows" policing and manner in which it is being applied to Named Plaintiffs and class members who are homeless is motivated by bias, negative attitudes, animosity, and fear directed at homeless people.

346.    The City's policy of "broken windows" policing and manner in which it is being applied to Named Plaintiffs and class members who are homeless is motivated by a desire to harm and punish a politically unpopular group with the intention of reducing the visibility of homelessness in the City. This policy was undertaken at the direction of the Mayor, whose stated goal is to ensure "the vagrants will be gone" from the downtown area and to "get rid of the homeless camps."

347.    The City's discriminatory intent is further demonstrated by: the Mayor's stated goal and directions to the police chief to use its "vagrant patrol" to identify and dismantle homeless camps; a discriminatory policy, practice or custom of arresting and jailing homeless people for conduct essential to human survival; and a discriminatory policy, practice or custom of stopping, tracking, and trespassing homeless people to push them out of public places.

348.    The City police department policies that include "Operation Street Sweeper," "Operation Innovation" and a "zero tolerance" action plan were adopted for the purpose of arresting homeless people for "quality of life" offenses that include innocent conduct such as sleeping, resting while awake, loitering, or otherwise being physically present in public places.

349.    The City intentionally discriminates on the face of its "open lodging" ordinance against persons experiencing homelessness by criminalizing sleeping or "resting while awake," without requiring other indicia of "lodging," if the person is homeless.

350.    The City's "zero tolerance" action plan gives police officers no discretion in deciding whether to arrest homeless individuals found sleeping in violation of the ordinance.

351.    The City's ordinance outlaws sleeping *per se* if the individual is homeless.

352.    The City has selectively and discriminatorily enforced the "open lodging" ordinance against homeless people, and they have been treated differently from others similarly situated. There is no rational basis for this differential treatment.

353.    The City's "open lodging" ordinance, and the manner in which it is being applied to Named Plaintiffs and class members, provides no opportunity for a homeless person to comply by seeking alternative shelter, and the City enforces the ordinance even though shelter is unavailable because the numbers of homeless people exceed the availability of shelter space.

354.    The City also enforces the "open lodging" ordinance against individuals who have no ability to access shelter because shelters are not open during times of enforcement, or individuals are otherwise excluded due to high-barrier admission requirements or trespass warnings. By contrast, general residents of Ocala who are not experiencing homelessness are allowed to sleep outside as long as when awakened they demonstrate they have housing where they reside.

355.    The City enforces its "open lodging" ordinance against Named Plaintiffs and class members who are "resting while awake" and homeless or if they are "resting while awake" and sitting on top of a blanket or near personal items. By contrast,

general residents of the City of Ocala who are not experiencing homelessness are allowed and invited to rest while awake in public places such as City parks, sit on top of blankets, and near personal belongings such as bags or coolers without being arrested.

356.   Forcing homeless individuals from public parks, streets, and from sheltered areas deprives homeless individuals of their right to engage in basic, life-sustaining conduct essential for human survival such as resting, sleeping, and protecting themselves from the elements.

357.   The City's lack of a rational government interest is evidenced by the fact that sleeping is not enough to arrest for the crime of open lodging if the individual is not homeless. However, if an individual is homeless then sleeping is prohibited. The City's ordinance therefore punishes people who have no alternative places to sleep while allowing the same conduct to occur for people who have access to housing and the ability to conform their conduct.

358.   As a direct and proximate result of the City's discriminatory policies and application of those policies to Named Plaintiffs and class members, they have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF
### ARTICLE I, SECTION IX, FLORIDA CONSTITUTION
### 28 U.S.C. §1367

359.   Plaintiffs incorporate and reallege paragraphs 1 through 279 as if fully set forth here.

360.    The City's policies of enforcing its open lodging ordinance, trespass exclusion orders against homeless people, and "broken windows" policing infringes on a fundamental right guaranteed to all Floridians under the State Constitution—the right to intrastate travel. The City's policies prevent homeless people from coming into the City; expels those already present from the City; and impedes their ability to move freely and engage in harmless, life-sustaining activities such as resting, sleeping, and attempting to protect themselves from the elements.

361.    Preventing homeless individuals from performing activities that are "necessities of life" such as sleeping or resting while awake in any public place when they have nowhere else to go effectively penalizes migration.

362.    The City's policies impede Named Plaintiffs and class members from moving freely throughout the City and engaging in basic life-sustaining activities essential for human survival such as resting, sleeping, and protecting themselves from the elements.

363.    The City's implementation of "broken windows" policing with the purpose of eliminating visible homelessness from the City has left Named Plaintiffs and class members with no place to be without facing the threat of arrest. This policy, the enforcement of its open lodging ordinance, and the issuance of trespass warnings banning people from public places, has the intended and actual effect of impacting freedom of movement by preventing homeless people from coming into the City and expelling those already present from the City.

364.    The City's "broken windows" policing, the City's enforcement of its open lodging ordinance, and the City's issuance of trespass warnings to exclude homeless people from public places infringe on the fundamental right to intrastate travel. The policies must be narrowly tailored to meet a compelling government interest in the least restrictive means possible.

365.    Because the City knows that there is not adequate and available shelter space in the City to meet the needs of the homeless population, there is no compelling interest for the City's policy of using its "open lodging" ordinance to arrest and remove homeless people from public places when they have no other place where they can lawfully be.

366.    Most of the arrests made under the City's "Operation Street Sweeper" policy, for example, involved "open lodging," and trespass from public places. All of those ordinances and policies are independently unconstitutional and punish homeless people for conducting necessary life-sustaining activities such as sleeping or resting, and physically being present in public places.

367.    The City's policies are not narrowly tailored. By design, the City casts a broad net to literally "sweep" homeless people off the streets and out of public view by sending them to jail or forcing them to leave the City altogether.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.  Certify this action as a class action and appoint individual Named Plaintiffs as class representatives;

2. Declare that Ocala City Code 42-10, and the policies, practices, and customs of the City used to enforce this ordinance, are unconstitutional in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution and the Florida Constitution both on their face and as-applied to Named Plaintiffs and class members;

3. Enter a permanent injunction requiring Defendant to stop arresting, citing, or otherwise enforcing Ocala City Code 42-10 (and the policies, practices and customs of the City used to enforce this ordinance) against Named Plaintiffs and class members;

4. Declare that Ocala's trespass policy, practice, or custom utilized to exclude Named Plaintiffs and class members from public property, including public parks, is unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution on its face and as-applied to Named Plaintiffs and class members;

5. Enter a permanent injunction requiring Defendant to rescind all trespass warnings issued in violation of the Due Process Clause of the U.S. Constitution excluding Named Plaintiffs and class members from public parks and other public property and stop issuing trespass warnings without due process pursuant to an unwritten and unlawful policy.

6. Award Plaintiffs their reasonable attorneys' fees, expenses, and costs; and

7. Grant such other relief as this Court deems just and proper.

Dated:          September 19, 2019

Respectfully submitted,

/s/Kirsten Anderson
Kirsten Anderson, Fla. Bar No. 17179
TRIAL COUNSEL
Kirsten.anderson@southernlegal.org
Chelsea Dunn, Fla. Bar No. 1013541
chelsea.dunn@southernlegal.org
Jodi Siegel, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601-4113
(352) 271-8890
Fax: (352) 271-8347

Jacqueline Nicole Azis, Fla. Bar No.101057
ACLU Foundation of Florida
4023 N. Armenia, Suite 450
Tampa, FL 33607
(786) 363-2708
Fax: (786) 363-2708
jazis@aclufl.org

Daniel Tilley, Fla. Bar No. 102882
ACLU Foundation of Florida
4343 W. Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Andrew Pozzuto, Fla. Bar No. 887617
Alavi & Pozzuto
108 N Magnolia Ave Ste 600
Ocala, FL 34475-6648
352-732-9191
Fax: 352-732-4892
apozzuto@theaplawgroup.com
ATTORNEYS FOR PLAINTIFFS

67