# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

PATRICK MCARDLE, COURTNEY
RAMSEY and ANTHONY CUMMINGS,

    Plaintiffs,

v.                                         Case No: 5:19-cv-461-Oc-30PRL

CITY OF OCALA, FL,

    Defendant.

## ORDER

In this putative class action, Plaintiffs seek injunctive and declaratory relief arising from alleged constitutional violations by the City of Ocala for enforcement of an ordinance impacting individuals experiencing homelessness. This matter is before the Court for consideration of two motions related to the same discovery dispute. First, the City filed a motion to compel the discovery of Plaintiffs' medical histories, and they have responded. (Docs. 19 & 20). Meanwhile, Plaintiffs filed a motion for a protective order and to quash the subpoena duces tecum directed at their medical providers, and Defendant responded. (Docs. 21 & 22). At issue is whether the City is entitled to discovery regarding Plaintiffs' mental and physical health and, if so, to what extent. For the reasons explained below, at this time the City shall be entitled to only limited discovery in the form of direct inquiry during Plaintiffs' depositions regarding their mental and physical health.

**I.    BACKGROUND**

Plaintiffs seek relief in this case on behalf of themselves and others similarly situated alleging that they "are homeless in that they are without fixed housing and lack the financial resources to provide for their own housing" and have been convicted under the challenged city

ordinance that prohibits "lodging in the open." (Doc. 1, p. 4-5). Plaintiffs specifically contend that they "are involuntarily unsheltered in that the number of available shelter beds is exceeded by the number of homeless people in the City of Ocala." (Doc. 1, p. 5). They further allege that the City lacks any "low-barrier shelters," defined as shelters that do "not have requirements that result in screening people out of eligibility for services, such as excluding people from shelter who do not have a state-issued identification, do not have minimum income, do not have any criminal history, or do not have any substance abuse issues." (Doc. 1, p. 14).

As the Court previously observed, "Plaintiffs allege they have been arrested for violating the open lodging ordinance during the day when homeless shelters are not open and on nights when the homeless shelters were at capacity, meaning Plaintiffs had no alternative place to sleep." (Doc. 14, p. 3). The Court further noted, "[b]ecause the ordinance applies even when there are no alternative places to rest, Plaintiffs argue that the ordinance provides no opportunity for the City's homeless residents to comply with it since sleeping is an involuntary act of basic survival." (Doc. 14, p. 3).

In addition to general allegations about the lack of overall capacity or available options because of an entity's policies (e.g., according to Plaintiffs the Salvation Army only allows people to stay for two weeks (Doc. 1, p. 17)), Plaintiff McArdle concedes he is ineligible for shelter at the Salvation Army because of a prior battery charge and because he was trespassed there (Doc. 1, p. 35) and Plaintiff Ramsey concedes she was precluded from the Salvation Army for a period of one year and from another shelter because of a medical condition (Doc. 1, p. 42).

On November 12, 2019, the City served interrogatories on Plaintiffs, including the following:

> List the names and business address of all physicians, medical
> facilities or health care providers by whom or at which you have

>been examined or treated in the past ten (10) years, including mental health care providers, and state as to each the dates of examination or treatment and the condition or injury for which you were examined or treated and the name and business address of all pharmacies which have filled prescriptions issued in connection with said treatment.

(Doc. 19, p. 18) (emphasis omitted). Plaintiffs, including Plaintiff Cummings (as an example), replied as follows:

>This question is overbroad in time and scope and not reasonably particularized. It calls for an oppressive catalogue of information . . . . This question calls for privileged and confidential health information protected from disclosure by federal and state medical privacy laws and federal privileges including the psychotherapist-patient privilege. Plaintiff Cummings has not placed his medical or mental health at issue and the information requested is harassing, irrelevant, and is not subject to discovery under Fed. R. Civ. P. 26(b).

(Doc. 19, pp. 18-19). Despite the objections, the City seeks to compel responses.

Further, the City announced its intent to serve Subpoenas Duces Tecum on February 24, 2020 on records custodians for various non-parties, including:

>1. Interfaith Emergency Services
>2. Salvation Army
>3. Marion County Health Department
>4. Quad County Treatment Center
>5. The Vines Hospital
>6. The Centers
>7. Ocala Regional Medical Center
>8. West Marion Community Hospital
>9. Advent Health
>10. Marion County Jail, Medical Unit

(Doc. 21-1). Plaintiffs responded by filing a motion to quash and for a protective order (Doc. 21).

As to the subpoenas, as an initial matter Plaintiffs do not object to the subpoenas to Interfaith Emergency Services or to Salvation Army, two entities that provide shelters in Ocala. Instead, the Plaintiffs object to, and seek an order quashing, the subpoenas to the eight medical providers (Marion County Health Department, Quad County Treatment Center, The Vines

Hospital, The Centers, Ocala Regional Medical Center, West Marion Community Hospital, Advent Health, Marion County Jail Medical Unit). Further, on the basis that the requests are overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and protected by the psychotherapist-patient privilege, Plaintiffs also seek a protective order regarding: (1) the medical information requested in Defendant's written discovery requests, (2) any of the same information at the Plaintiffs' upcoming depositions, and (3) any further discovery into the subjects of Plaintiffs' medical treatments, mental-health treatments, and substance-use treatments.

Because Defendant's motion to compel and Plaintiffs' motion to quash and for protective order deal with the same issues, the Court will address them together.

## II. LEGAL STANDARDS

Generally, parties are entitled to discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering various factors. Fed. R. Civ. P. 26(b)(1). Under Rule 26, however, the Court has broad discretion to limit the time, place, and manner of discovery as required "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The Court's exercise of discretion to appropriately fashion the scope and effect of discovery will be sustained unless it abuses that discretion to the prejudice of a party. *Amey, Inc. v. Gulf Abstract & Title, Inc*., 758 F.2d 1486, 1505 (11th Cir.1985); see also *Moore v. Armour Pharm. Co*., 927 F.2d 1194, 1197 (11th Cir.1991) ("The trial court ... has wide discretion in setting the limits of discovery, and its decisions will not be reversed unless a clearly erroneous principle of law is applied, or no evidence rationally supports the decision.").

Relevancy and proportionality are the guiding principles: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case." Fed. R. Civ. P. 26(b). In order to determine the scope of discovery the Courts and the parties must consider and evaluate "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* ("The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Comment, 2015 Amendment).

In order to frame and resolve the discovery dispute, it is essential to determine what the purpose of the discovery is. That will help determine what the parties need (or don't need) and hopefully the most cost and time effective way to get there. Indeed, as the commentary to Rule 26 informs us, "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." *Id*. Then, of course, it is the "Court's responsibility, using all the information provided by the parties, . . . to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." *Id*.

### III. DISCUSSION

#### A. Framing

1. For context, a useful place to begin is with the parties' theories of the case and their narratives regarding homelessness. A review of the complaint and answer, not to mention the parties' pleadings in this case, reveals that this action reflects differing views regarding homelessness. The opening paragraph of Plaintiffs' complaint reveals this tension: "The City of Ocala is trying to force homeless people to leave town. The Mayor's goal is to ensure 'vagrants will be gone' from the City's downtown area." (Doc. 1, p. 1). Indeed, much of the 67-page

complaint is devoted to general statements and data regarding housing affordability and homelessness in Ocala. Plaintiffs' theory of the case is that they are involuntarily unsheltered because of the lack of available shelter beds and the lack of "low-barrier shelters."

The City, on the other hand, contends (and seeks to establish) that Plaintiffs were unsheltered because of their own conduct (voluntary conduct, as the City would describe it), and that they are chronically homeless due to multiple factors, including mental health, substance abuse and behavioral issues. The City maintains that regardless of the outcome of this case it will not provide the homeless shelters Plaintiffs apparently seek: "The City cannot afford it, nor are its citizens likely to support it. The City does not provide public housing services for the homeless (low barrier or otherwise) and a loss in this matter would not change that." (Doc. 19, p. 12). The Court pauses here to note that the relief sought – or rather the relief that can be afforded – is not the compelled creation of homeless shelters, but instead the prohibition of enforcement of the ordinance.

The description of something as voluntary or involuntary is driving the parties' theories and comes from passages in the caselaw. In *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1564 (S.D. Fla. 1992), for example, the court found that Miami's practice of arresting homeless plaintiffs who did not have "a single place where they can lawfully be" was unconstitutional under the Eighth Amendment. The court explained: "[P]laintiffs do not have the choice, much less the luxury, of being in the privacy of their own homes. Because of the unavailability of low-income housing or alternative shelter, plaintiffs have no choice but to conduct involuntary, life-sustaining activities in public places. The harmless conduct for which they are arrested is inseparable from their involuntary condition of being homeless." *Pottinger* 810 F. Supp. at 1564. In *Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000), the court found, on the other hand, that "The City

[of Orlando] is constitutionally allowed to regulate where 'camping' occurs, and the availability of shelter space means that [plaintiff] had an opportunity to comply with the ordinance." In *Joel* there appeared to be adequate shelter available. *Id.* ("[T]he City has presented unrefuted evidence that the Coalition, a large homeless shelter, has never reached its maximum capacity and that no individual has been turned away because there was no space available or for failure to pay the one dollar nightly fee.").

2.  Here, the question currently before the Court is whether the City of Ocala is entitled to discovery of Plaintiffs' medical records, including information regarding their mental and physical health, and if so, to what extent. Based on the allegations in the Complaint, the City contends that Plaintiffs have put into issue the underlying cause of their inability to obtain shelter. The City further contends that whether Plaintiffs were unable to obtain shelter because of reasons such as the shelters being at capacity or closed, or whether they were unable to obtain shelter due to their own conduct is "critical to determining the viability of their own claim and whether they are qualified to act as class representatives." (Doc. 19, p. 10). The City argues that discovery into Plaintiffs' medical histories, including substance abuse issues and mental health issues, is thus highly relevant to the claims and defenses in this case. Indeed, the City seeks years of such records and insists it has a "right" to determine why the Plaintiffs are homeless. (Doc. 19, p. 12). To this end, the City has pled the following affirmative defense: "To the extent the Plaintiffs have alleged a legally cognizable claim based on the City's alleged policies which prohibit the involuntary act of sleeping, the Plaintiffs are precluded from bringing such claims because their acts of sleeping in public were caused by their own, voluntary, behavior." (Doc. 15, p. 24).

In support of this point, the City cites information obtained through public records that it argues "suggest significant mental health and substance issues have caused or significantly

contributed to [Plaintiffs'] inability to find adequate shelter." (Doc. 19, p. 7). The City cites to records reflecting Plaintiff McArdle's ongoing behavioral issues, criminal history, and alcohol abuse, including numerous incidents of being arrested while intoxicated. The City cites to similar examples regarding Plaintiff Ramsey and Cummings's history with law enforcement reflecting numerous incidents of intoxication. The City contends that records obtained in discovery suggest that the reason Plaintiffs may not be able to secure consistent shelter is due to ongoing substance abuse issues, as differentiated by the allegations made in the Complaint.

The City further relies upon this Court's order denying its motion to partially dismiss the Complaint, wherein the Court stated:

> While the City relies on *Joel* [*v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000)] to argue that Plaintiffs' claims are barred, the Court concludes *Joel* is inapplicable- at least at this stage. The Eleventh Circuit noted several times in *Joel* that the Orlando ordinance did not apply unless there were alternative places for the homeless residents to sleep. Here, though, Plaintiffs allege that they were arrested for violating the ordinance when there were no alternative places to sleep, either because it was during the day when shelters were closed or because the shelters were at capacity. This distinction matters.

(Doc. 14, p. 7).

Following the Court's order, the City contends that it initiated discovery to determine "what caused the Named Plaintiffs' to sleep in public on any of the days in question, and why they believe it is inevitable that they will continue to do so in the future." (Doc. 19, p. 5). In particular, the City seeks "discovery to determine whether the reason the Named Plaintiffs have not been able to secure proper shelter is because there were insufficient beds made available to the homeless population generally, or whether the 'high-barriers' present in these shelters were why the Named Plaintiffs, specifically, could not receive shelter." (Doc. 19, p. 5).

Plaintiffs' primary objection is that they have not put their mental and medical health into dispute in this lawsuit which is limited to a constitutional challenge to a City ordinance and policies seeking injunctive relief and declaratory judgment. Plaintiffs argue that they have not, for example, pled claims for physical injury or emotional distress. As distinguished from the instant case, Plaintiffs cite *Walker v. City of Orlando*, Case No. 6:07-CV-651-ORL-19DAB, 2007 WL 3407409, at *1 (M.D. Fla. Nov. 13, 2007), which involved a claim for personal injury arising from alleged excessive use of force as an example of one's mental and physical condition being in controversy.

Further, Plaintiffs' contend that even if one's mental health were a factor in a case, that wouldn't necessarily make it discoverable. For example, in *Chase v. Nova Se. Univ., Inc*., Case No. 11-61290-CIV, 2012 WL 1936082, at *4 (S.D. Fla. May 29, 2012), the court found that the psychotherapist-patient privilege was not waived because, although the plaintiff alleged a claim under the Americans with Disabilities Act, the issue was whether plaintiff was perceived as mentally ill, not whether plaintiff was actually mentally ill. *Id.* at *4. The court there also noted that plaintiff did not contend his mental condition was exacerbated by the termination of his employment, plaintiff had not conceded that his medical condition was at issue, and plaintiff represented that his doctors would not be called as damages witnesses. *Id*. at *5.

Plaintiffs also object that the information sought is overbroad, oppressive and not reasonably particularized to the facts of this case. Plaintiffs object to the 10-year scope of the discovery request and characterize it as a "fishing expedition." (Doc. 20, p. 2).

In considering this issue, it is worth noting that neither of the parties have cited any authority that directly addresses the unique circumstances of the instant case. To be sure, courts frequently permit discovery into a plaintiff's medical and psychological history when the plaintiff

has pled a claim for emotional distress damages. *See Gabe McIntyre, v. Delhaize America, Inc. D/B/A Sweetbay Supermarket*., No. 8:07-CV-2370-T-30MSS, 2008 WL 11336308, at *2 (M.D. Fla. June 26, 2008) (permitting discovery into Plaintiff's medical and psychological history upon a finding that plaintiff's claim for emotional damages placed his mental health into issue). And, Plaintiffs cite the factors applied by courts in considering the appropriateness of a Fed. R. Civ. P. 35(a) mental examination in determining whether a plaintiff has placed his or her mental condition into issue. *See Chase*, 2012 WL 1936082 at *4. Those factors include (1) stating a tort claim for intentional or negligent infliction of emotional distress; (2) alleging a specific mental or psychiatric injury or disorder; (3) alleging unusually severe emotional distress; (4) intending to offer expert testimony to support a claim for emotional distress damages; and (5) conceding that his or her mental condition is in controversy. *Id.* at *4.

It is undisputed that in this action Plaintiffs only seek injunctive relief and declaratory judgment. Plaintiffs specifically do not seek damages for any type of emotional distress or injury. Further, none of the above factors for placing a mental condition into issue are implicated. Plaintiffs contend that their personal medical treatment and diagnosis history is not relevant to the issues in this case, including whether shelters in Ocala are accessible and available to them and other individuals experiencing homelessness in Ocala.

Defendant's position is essentially that the underlying cause of Plaintiffs' inability to obtain shelter is the central issue in this case and, as an affirmative defense, Defendant contends Plaintiffs' homelessness is due to their own voluntary conduct. As the Court observed in its recent order regarding the motion to partially dismiss the complaint, it is important to determine the specific reasons why there were no alternative places for Plaintiffs to sleep at the times in question. Similarly, Defendant characterizes the issue as whether there "were insufficient beds made

available to the homeless population generally, or whether the 'high-barriers' present in these shelters were why the Named Plaintiffs, specifically, could not receive shelter." (Doc. 19, p. 4).

The City's defense, which drives its request for these plaintiffs' medical records, is based on a proposition for which they cite no binding precedent. The City's argument seems to be that the homeless Plaintiffs had an opportunity to comply with the ordinance but couldn't because of their own *voluntary* conduct, namely mental health issues or alcoholism, or both. And that because they had an opportunity to comply *but for* their own conduct, the ordinance is constitutional. The City's discovery request seems to put the cart before the horse: it assumes that conduct it calls "voluntary" – one's mental health condition and alcoholism – is indeed voluntary conduct for purposes of fitting it's ordinance into the legal framework discussed in *Joel*, 232 F.3d at 1362. Even if the City is right, then the question with respect to this discovery dispute is whether a named plaintiff was (or perhaps would be) precluded because of his or her mental health condition or substance abuse. If a named plaintiff was or would be excluded from an available shelter for one of those reasons, and the named plaintiff concedes as much, then further details of the plaintiff's condition (which would be gained through medical records), would be irrelevant. If one of the entities precluded a named Plaintiff for that reason, but the named plaintiff disputed having the condition, the relevance of those medical records may become more important.

**B.     Analysis**

With this framing of the issue, it would seem that documents such as police records and incident reports regarding Plaintiffs' arrests would be highly relevant. Also highly relevant would be policies and records from the existing shelters regarding the times or days in question, and Plaintiffs' eligibility (or lack thereof) to enter the shelter. Notably, Plaintiffs do not object to the

discovery requests directed to the shelters. Thus, the City either has or will be able to obtain relevant information about the incidents in question and the Plaintiffs' eligibility.

To analogize from employment discrimination cases such as *Chase*, 2012 WL 1936082 at *4, what appears highly relevant is not so much whether Plaintiffs actually suffered from substance abuse or other conditions, but whether the shelters perceived them to have substance abuse issues (or other issues) that disqualified them from eligibility at the shelters. The undersigned agrees that the nature and actual extent of any medical or mental conditions of the Plaintiffs may be relevant in this action, but that Rule 26(b)(1) requires the Court to consider what is proportional to the needs of the case, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Most discovery disputes involve the need to balance these factors. Here, through police reports, public records, and shelter records, it appears that the City already has or will obtain access to much information that is relevant to its affirmative defense, assuming it is a viable one. The City's affirmative defense (again) is that Plaintiffs' "acts of sleeping in public were caused by their own, voluntary, behavior." It is not entirely clear, however, how that defense warrants the City's need for broad discovery regarding medical and mental health conditions, as opposed to information about the specific sleeping incidents in question. And, as noted, if a plaintiff concedes his or her ineligibility or denial because of a specific condition or circumstance, the details of the plaintiff's condition surround it seem irrelevant.

The City's motion cites numerous examples that it maintains reflect mental health and substance issues on the part of Plaintiffs. For example, the City notes that Plaintiff McArdle was

arrested for battery and was intoxicated at the time of arrest. The City thus argues that "these records suggest that the reason why McArdle may not be able to secure consistent shelter is related to ongoing behavior issues, criminal history, and alcohol abuse." (Doc. 19, p. 7). The City's argument pertains to McArdle's general ability to secure consistent shelter, as opposed to the reasons McArdle was sleeping in public at the time of a particular arrest. Further, it is unclear whether McArdle disputes the behavior and alcohol issues alleged. And, it is particularly unclear what 10 years' worth of Plaintiffs' medical and mental health records would add. The considerable burden to Plaintiffs and their care providers, as well as privacy concerns, weigh against allowing such broad discovery in the context of this case and at this stage of proceedings.

The City's contention that why the named Plaintiffs are homeless (as opposed to a more limited inquiry about why they were unable to, or didn't, obtain shelter on the dates of their arrests, or even why they can't in the future) goes to whether they can represent a potential class, is similarly overbroad. It is unclear how the requested broad discovery from health providers of the named Plaintiffs would add much to these specific issues beyond what will be revealed from information sources such as the shelter records, police reports, and Plaintiffs' own depositions. Further, as previously stated, to the extent one or more of the Plaintiffs doesn't dispute his or her ability to seek shelter because of "high barriers", that concession alone should satisfy the City's inquiry and enable the City to pursue its defense, without the need for those medical records that would provide much personal detail and merely confirm a plaintiff's concession. Balancing the considerations under Rule 26(b)(1), the undersigned finds that the benefit of granting the broad discovery requested (10 years of records from Plaintiffs' medical providers and pharmacies) is outweighed by the burden of the proposed discovery and the privacy concerns of Plaintiffs.

Turning specifically to Plaintiffs' motion then, they seek a protective order to prevent the compelled disclosure of (1) the medical information requested in written discovery requests, (2) any of the same information at the Plaintiffs' upcoming depositions, and (3) any further discovery into the subjects of Plaintiffs' medical treatments, mental-health treatments, and substance-use treatments on the basis that such inquiries are prohibited as overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and protected by the psychotherapist-patient privilege.

The Court has already addressed the broad discovery requests and subpoenas seeking 10 years of medical and mental health records and found them unwarranted at this time. As to the scope of Plaintiffs' depositions, however, the Court finds the Rule 26(b)(1) considerations weigh somewhat differently. The burden of allowing limited deposition questions is not substantial, as Plaintiffs will presumably be deposed regarding numerous other topics related to their claims, including the circumstances surrounding specific sleeping incidents. Further, Plaintiffs are represented by experienced and able counsel who can ensure privileges are protected. While Plaintiffs shall not be compelled to reveal any information that is protected by the psychologist-patient privilege during Plaintiffs' depositions, the Court finds it reasonable to allow limited inquiry into any specific physical or mental health conditions that bear upon either (1) the reasons Plaintiffs were sleeping in public at the time of any particular arrest in question; (2) any behavior issues, substance abuse issues, criminal history or other reasons Plaintiffs have been ineligible to stay at existing shelters or may be in the future and (3) any mental or physical health issues that impact Plaintiff's ability to obtain shelter generally, including in the future. Such inquiry during depositions should generally be limited in scope to two years prior to and following any specific arrest at issue.

Finally, the Court recognizes that the question of relevance evolves as the legal and factual issues develop. What is of less relevance today may be of more relevance later. This ruling captures the Court's best attempt to weigh the considerations of Rule 26(b)(1) given the current stage of proceedings. The current rulings are without prejudice to the right of any party to renew discovery requests if warranted by good cause later in the litigation. And, of course, the scope of discovery does not determine what evidence will be admissible at trial or upon consideration of dispositive motions.

That said, the parties are highly encouraged to work together closely in a spirit of cooperation as they navigate further discovery in this case, mindful of the considerations that must be balanced, the guidelines of this Order, the discovery rules, and Local Rule 3.01(g). The parties should utilize these resources to the best of their abilities, as well as possible confidentiality orders, as they proceed.

## IV. CONCLUSION

For the reasons stated above, the City of Ocala's motion to compel discovery of medical history (Doc. 19) is **DENIED.** Plaintiffs' motion (Doc. 21) for an order quashing the Defendant's subpoenas to the eight medical providers (Marion County Health Department, Quad County Treatment Center, The Vines Hospital, The Centers, Ocala Regional Medical Center, West Marion Community Hospital, Advent Health, Marion County Jail Medical Unit) is **GRANTED,** and those subpoenas are hereby **QUASHED**. Plaintiffs' motion for a protective order (Doc. 21) is **DENIED** to the extent that a limited inquiry is permitted during Plaintiffs' depositions as explained in this Order, but is otherwise **GRANTED**.

**DONE** and **ORDERED** in Ocala, Florida on March 31, 2020.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties